# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHRISTINE LEVINSON *et al.*,

        *Plaintiffs*,

       v.

THE ISLAMIC REPUBLIC OF IRAN,

        *Defendant*.

Civil Action No. 17-511 (TJK)

## <u>MEMORANDUM OPINION</u>

Robert Levinson, a retired Special Agent with the FBI and DEA, was looking forward to returning home from an overseas business trip in March 2007. When he returned, he planned to talk to the oldest of his seven children about her career plans. And from abroad, he emailed his youngest daughter, wishing her good luck on her student government election, and his oldest son, promising to get him a new laptop before he started law school in the fall. He planned a brief stop at Kish, an Iranian island in the Persian Gulf. But thirteen years ago today, Levinson was kidnapped while on Kish. He never made it home. And three years later, his family received a video showing him frail, gaunt, and begging for his life. Now no one knows Levinson's fate. If he is alive, he would be the longest-held civilian hostage in American history.

Since the day he was kidnapped, his wife and seven children have not spoken with him. He has been unable to see his children grow up, enjoy professional success, marry, and become parents themselves—as they have many times over. But they have not forgotten him, not by a long shot. On their wedding days, his daughters tied his picture to their bouquets so they could say their father walked them down the aisle. One named a son after him. And his entire family

has worked tirelessly to recover him from his captors and keep what happened to him in the public eye. This case, brought by Levinson's family against the Islamic Republic of Iran for his hostage taking and torture under the terrorism exception to the Foreign Sovereign Immunities Act (FSIA), is largely about whether it was the Iranian regime that committed these barbarous acts. The Court finds, in no uncertain terms, that it was. For the reasons explained below, the Court will grant the pending motion for default judgment and enter judgment against Iran.

## I. Background

### A. Factual Background

Levinson served as a Special Agent with the Drug Enforcement Administration (DEA) and then, for 22 years, as a Special Agent with the Federal Bureau of Investigation (FBI). Christine Hrg. Tr. 91:11–92:3.[1] He retired in 1998, and afterward worked as a private investigator. *Id.* 92:4–25. Levinson was extraordinarily devoted to his family. Each of his children testified about his loving, supportive, and powerful presence in their lives. *See* Douglas Hrg. Tr. 18:18–21:5; Samantha Hrg. Tr. 173:2–175:11; Sarah Hrg. Tr. 189:22–191:7; Daniel Hrg. Tr. 205:21–206:21; Stephanie Hrg. Tr. 48:13–51:22; David Hrg. Tr. 66:7–67:10; Susan Hrg. Tr. 82:9–83:2. On the last Valentine's Day before his abduction, Levinson—who was away on another business trip—emailed his wife Christine to say, "i really, really don't want to do this forever = i'd rather be home with you." Christine Ex. 3.[2]

---

[1] For clarity and conciseness, hearing transcripts and exhibits will be cited by using the first names of Levinson family members.

[2] This email and similar ones between Levinson and his family members are admissible as evidence of the sender's then-existing mental, emotional, or physical condition. *See* Fed. R. Evid. 803(3).

In early March 2007, Levinson flew to Dubai on business. From there, he planned to take a brief side trip to Kish, for a meeting with a potential source. The meeting related to an investigation he was conducting into allegations that Iranian officials were skimming the regime's oil profits and hiding the money in overseas investments. Christine Hrg. Tr. 103:17–104:9; Silverman Hrg. Tr. 64:13–65:3; Dobbs Hrg. Tr. 93:5–20; *see* Dobbs Ex. 7.[3] Levinson planned the trip to be so quick that he left his suitcase at his hotel in Dubai. *See* Gritz Hrg. Tr. 131:14–22; Daniel Hrg. Tr. 220:5–7. Levinson also made plans to see a friend during his layover in London on his way home. Dobbs Hrg. Tr. 95:18–96:8; Dobbs Ex. 3. Levinson traveled to Kish and met with the source at the Hotel Maryam on March 8. *See* Silverman Hrg. Tr. 75:6–12, 82:24–83:12; Silverman Ex. 3 (showing Levinson planned—indeed was about to begin—his to travel to Kish on March 8); Silverman Ex. 10 (showing Levinson planned to meet with the source at the Hotel Maryam that same day).[4] The next day, Levinson signed out of the hotel and vanished.[5] He did not leave the island on a commercial flight, since his name did not appear on any such flight manifest. Gritz Hrg. Tr. 148:12–14; Daniel Hrg. Tr. 220:2–4.

A little less than a month later, the Iranian government's English-language media outlet, Press TV, published an article entitled "Ex-FBI man in Iran not 'missing' at all." ECF No. 37-5;

---

[3] This email and similar ones are admissible as evidence of Levinson's travel plans. *See* Fed. R. Evid. 803(3).

[4] When Levinson traveled to Kish, he brought a book to give to the potential source as a gesture of goodwill. Christine Hrg. Tr. 108:1–23. In December 2007, Levinson's wife and son Daniel traveled to Iran and met with the source, who returned the book to them, proving that Levinson had met with the source before being abducted. Christine Hrg. Tr. 108:8–23; Daniel Hrg. Tr. 217:8–24.

[5] Levinson's wife and son Daniel saw his signature in the hotel's guest book when they traveled to Iran. Christine Hrg. Tr. 102:13–103:13; Daniel Hrg. Tr. 215:2–216:16; *see also* Gritz Hrg. Tr. 147:14–148:3, 163:6–164:3.

*see* Clawson Hrg. Tr. 122:17–123:11 (expert witness's description of Press TV as an arm of the Iranian government); Gritz Hrg. Tr. 155:17–21 (same). Although it did not mention Levinson by name, the article reported that an "American businessman and retired FBI agent gone missing from Iran's Kish Island" had been "in the hands of Iranian security forces since the early hours of March 9." ECF No. 37-5 at 1. The article also reported that while the matter had been "complicated" by tensions between the United States and Iran, "the authorities [were] well on the way to finishing the procedural arrangements that could see him freed in a matter of days." *Id*. The article repeated that "[i]t is expected the matter will be over in a few days time." *Id.* at 2. But the days, months and years passed, and the matter was *not* over for Levinson and his family.

Then, in November 2010, Levinson's wife, his friend Ira Silverman, and a reporter received an email asking for $3 million and the release of several prisoners in exchange for Levinson's life. ECF No. 37-10. The email also attached a video of Levinson, in which he appears gaunt, frail, and unhealthy. Ex. 6a. Levinson's wife testified that the video showed that he had lost significant weight—about 50 pounds—and hair since his abduction. Christine Hrg. Tr. 111:16–25. His wife also noted that he was still wearing his white polo shirt, although it was by then ragged and torn. *Id.* 100:17–101:7. In the video, Levinson says in a hoarse voice that he is "not in very good health" and is "running very quickly out of diabetes medicine." Ex. 6a. He begs his family and the United States government for help, asking them to "answer the requests of the group that has held" him and bring him home. *Id.* And he closes by pleading that "thirty-three years of service to the United States deserves something." *Id.* Levinson's family responded to the email, but never received a reply. Douglas Hrg. Tr. 31:19–24.

Six months later, in April 2011, the family received another email, this time attaching five photographs of Levinson, whose appearance was by then almost unrecognizable. ECF No.

37-12.  In the photographs, Levinson has long hair and a scraggly beard.  Ex. 7a–7e.  He is

dressed in an orange jumpsuit, and he has a chain wrapped around each wrist and across his

neck.  *Id.*  In each picture, he holds a sign with a different caption, which reads: "HELP ME,"

"WHY YOU CAN NOT HELP ME," "THIS IS THE RESULT OF 30 YEARS SERVING FOR

USA," "4TH YEAR… You Cant or you don't want…?" and "I Am HERE IN GUANTANAMO

DO YOU KNOW WHERE IT IS?"  *Id.*  The email accompanying the five photographs stated:

"We are waiting."  ECF No. 37-12.

Levinson's family long suspected that the Iranian regime was responsible for his

kidnapping.[6]  And later in 2011, Douglas Coe, an American religious leader with informal

contacts with the Iranian government, agreed to write a letter on Levinson's behalf to Ayatollah

Khamenei, Iran's Supreme Leader.  Eshel Hrg. Tr. 6:2–23, 7:10–19.  Shortly after the letter was

delivered to the Iranian Embassy in Paris, the Iranian Ambassador there, Seyed Mehdi

Miraboutalebi, requested a meeting with Coe on short notice.  *Id.* 7:19–24.  Coe, unable to

attend, asked his friend Ory Eshel to attend instead.  *Id.* 7:24–8:3. The primary purpose of the

hour-and-a-half meeting was to discuss Levinson's status.  *Id.* 8:4–8, 9:8.  Ambassador

Miraboutalebi told Eshel that his goal was to thaw relations between Iran and the United States.

*Id.* 9:7–13.  As a first step, he hoped to convince the United States to delay the publication of a

forthcoming International Atomic Energy Agency (IAEA) report which he anticipated would

reflect negatively on Iran.  *Id.* 9:7–10:10.  In return, while he could not make any guarantees,

---

[6] For this reason, Levinson's wife and son Daniel traveled to Iran to seek information about
Levinson's disappearance and work towards his release, but according to Daniel they were given
"the runaround" by Iranian officials.  Daniel Hrg. Tr. 207:6–7; *see id.* 214:25–217:7.

Ambassador Miraboutalebi told Eshel "that he was hopeful that Ayatollah Khamenei would work for Mr. Levinson's release." *Id.* 10:11–11:3.[7]

### B.      Procedural Background

In March 2017, Levinson's wife Christine—as Levinson's conservator and on her own behalf—and his children, Susan Levinson Boothe, Stephanie Levinson Curry, Sarah Levinson Moriarty, Samantha Levinson Bowman, Daniel Levinson, David Levinson, and Douglas Levinson ("the Levinsons"), sued Iran for Levinson's hostage taking and torture under the terrorism exception to the Foreign Sovereign Immunities Act (FSIA).[8]  *See* ECF No. 1 ("Compl.").  In May 2018, the Clerk of Court mailed a copy of the summons and complaint, along with a translation of each, to the head of Iran's foreign ministry through an international courier under 28 U.S.C. § 1608(a)(3).  ECF No. 24.  After the summons was returned unexecuted, the Clerk sent the same materials to the State Department to effectuate diplomatic service under 28 U.S.C. § 1608(a)(4).  ECF No. 29.  Service was effectuated on Iran through the Embassy of Switzerland in Tehran in October 2018.  ECF No. 33.

Iran never responded to the complaint or otherwise appeared.  In December 2018, the Clerk entered default against Iran.  ECF No. 35.  In February 2019, the Levinsons moved for default judgment against Iran.  ECF No. 37.  In December 2019, the Court held a two-day evidentiary hearing on the motion for default judgment.  The Court received testimony from each

---

[7] Ambassador Miraboutalebi's statements are admissible as non-hearsay because they were made by an agent of Iran, the opposing party, within the scope of the agent's employment.  *See* Fed. R. Evid. 801(d)(2)(D).

[8] The Levinsons also asserted several state law claims, which, because they are all U.S. citizens, are "redundant of their federal law claims and do not provide them any additional right to recover." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 89 (D.D.C. 2018).

of the eight members of the Levinson family and several other fact witness, whose testimony is summarized above.

The Court also heard from three expert witnesses. The first expert, Robyn Gritz, is a former Supervisory Special Agent in the FBI's Counterterrorism Division. Gritz Hrg. Tr. 110:23–111:5. During her career there, she worked on both foreign and domestic counterterrorism cases, and for a time she supervised the FBI's investigation into Levinson's disappearance. *Id.* 109:2–14, 123:16–125:14. The Court qualified her as an expert on counterterrorism investigations, particularly counterterrorism investigations involving hostage taking. *Id.* 138:17–23. The second, Dr. Shaul M. Gabbay, is the Director of the Global Research Institute at the Posner Center for International Development, a think tank focusing on the Middle East. Gabbay Hrg. Tr. 16:24–17:8. The Court qualified him as an expert in the current conditions in Iran, the treatment of prisoners in Iran, and the regime's use of torture. *Id.* 17:13– 20. The third, Dr. Patrick J. Clawson, is the Director of Research at another think tank, the Washington Institute for Near East Policy. Clawson Hrg. Tr. 115:22–116:13. Dr. Clawson has testified as an expert in cases against Iran in many courts, including this District. *See, e.g.*, *Salzman v. Islamic Republic of Iran*, Civil Action No. 17-2475 (RDM), 2019 WL 4673761 at *5 (D.D.C. Sept. 25, 2019); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 12 (D.D.C. 2018); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 77 & n.2 (D.D.C. 2017); *see also* ECF No. 37-23 (Clawson Decl.) at 35–36 (listing cases). The Court qualified him as an expert on Iran, its economy and politics, and its sponsorship of terrorism. Clawson Hrg. Tr. 121:2–5.

## II.    Legal Standards

Under Federal Rule of Civil Procedure 55(b)(2), a court may consider entering a default judgment when a party applies for that relief. *See* Fed. R. Civ. P. 55(b)(2). "[S]trong policies favor resolution of disputes on their merits," and so "'[t]he default judgment must normally be

viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).

Still, "entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted). A court retains its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6. And "plaintiffs retain 'the burden of proving personal jurisdiction, [and] they can satisfy that burden with a *prima facie* showing.'" *Id.* at 7 (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991)). In doing so, "they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.*

"When default judgment is sought under the FSIA, a claimant must 'establish[] his claim or right to relief by evidence satisfactory to the court.'" *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (quoting 28 U.S.C. § 1608(e)). And courts must apply that standard mindful that "Congress enacted the terrorism exception expressly to bring state sponsors of terrorism . . . to account for their repressive practices," *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014), and to "punish foreign states who have committed or sponsored such acts and deter them from doing so in the future," *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002).

As a result, the D.C. Circuit has instructed that "courts have the authority—indeed . . . the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Id.* at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)). To be sure, courts must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)). But uncontroverted factual allegations that are supported by admissible evidence may be taken as true. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015). And § 1608(e) "does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." *Owens v. Republic of Sudan,* 864 F.3d 751, 785 (D.C. Cir. 2017).

In a FSIA default proceeding, a court can find that the evidence presented is satisfactory "when the plaintiff shows 'her claim has some factual basis,' . . . even if she might not have prevailed in a contested proceeding." *Id.* at 785 (citations omitted). "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id.* Thus, courts are given "an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism." *Id.* And this discretion extends to the admission of expert testimony, often "of crucial importance in terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain," "[v]ictims of terrorist attacks . . . are often . . . unable to testify about their experiences," and "[p]erpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection." *Id.* at 787 (citations omitted). Moreover, "[e]yewitnesses in a state that sponsors terrorism are similarly difficult to locate" and "[t]he sovereigns themselves often fail to appear and to

participate in discovery." *Id.*  For these reasons, the D.C. Circuit has recognized that "reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception." *Id.*

## III.   Analysis

### A.   Subject-Matter Jurisdiction

The FSIA terrorism exception provides federal courts with subject-matter jurisdiction over cases "in which money damages are sought against a foreign state for personal injury or death that was caused by" an enumerated terrorist act.  28 U.S.C. § 1605A(a)(1); *see also* 28 U.S.C. § 1330.  As relevant here, the plaintiffs must prove four elements to establish subject-matter jurisdiction under the terrorism exception: (1) the foreign state was designated a state sponsor of terrorism when the act of terrorism occurred and when this action was filed; (2) the claimant or victim was a national of the United States at the time of the act; (3) the claimant afforded the foreign state a reasonable chance to arbitrate the claim; and (4) the damages sought are for personal injury or death caused by the act of terrorism.  *See Akins*, 332 F. Supp. 3d at 32; 28 U.S.C. § 1605A.  The Levinsons have proven all these elements.

### 1.   Iran Was Designated a State Sponsor of Terrorism

The State Department designated Iran a state sponsor of terrorism on January 19, 1984, and Iran has remained so designated since.  *See* State Sponsors of Terrorism, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism (last visited Mar. 5, 2020).

### 2.   Plaintiffs Are U.S. Citizens

Levinson and his family are and were at all relevant times United States citizens. Douglas Hrg. Tr. 17:20–22; Samantha Hrg. Tr. 171:17–18; Sarah Hrg. Tr. 188:12–13; Daniel Hrg. Tr. 204:23–24; Stephanie Hrg. Tr. 47:20–21; David Hrg. Tr. 65:13–14; Susan Hrg. Tr.

81:20–21; Christine Hrg. Tr. 91:5–10. And United States citizens are nationals for FSIA purposes. 28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22).

### 3. Plaintiffs Offered to Arbitrate Their Claims

"The FSIA 'does not require any particular form of offer to arbitrate, simply the extension of a "reasonable opportunity."'" *Warmbier*, 356 F. Supp. 3d at 45 (quoting *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003) (*Simpson I*)). The Levinsons included an Offer to Arbitrate with the summons and complaint, which were served on Iran on October 1, 2018. ECF No. 39-1 at 1–8, 44–49. The document offered "to submit the claims in this action to arbitration in accordance with accepted international rules of arbitration" and gave Iran fifty days to accept the offer by notifying the Levinsons' counsel in writing or filing an acceptance with the Clerk of Court. *Id.* at 44–45; *see* 28 U.S.C. § 1605A(a)(2)(A)(iii). Iran did not respond. As a result, this element is satisfied. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 66 (D.D.C. 2015); *Simpson I*, 326 F.3d at 233.

### 4. Iran's Actions Qualify for the Terrorism Exception

The fourth element of subject-matter jurisdiction under the FSIA terrorism exception is that the plaintiffs seek damages for personal injury or death caused by the foreign state's commission of at least one terrorist act enumerated in the statute, including "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). The Levinsons allege that Iran took Levinson hostage and tortured him. *See* ECF No. 37 at 10–17. On both counts, they have met their burden.

#### a. Hostage Taking

Hostage taking under the FSIA is defined by Article 1 of the International Convention against the Taking of Hostages, which states:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person . . . in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages.

28 U.S.C. § 1605A(h)(2); International Convention Against the Taking of Hostages art. 1, U.N. GAOR, 34th Sess., Supp. No. 46. at 245, U.N. Doc. A/34/46 (1979). Hostage taking thus has two elements: the abduction or detention, and the purpose of accomplishing "the sort of third-party compulsion described in the [C]onvention." *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 559 (D.C. Cir. 2006) (*Simpson II*) (quoting *Price*, 294 F.3d at 94). In other words, to satisfy the second element, "the plaintiff[s] must identify a 'nexus between what happened to [the hostage] in [the foreign state] and any concrete concession that [the foreign sovereign] *may* have hoped to extract from the outside world.'" *Warmbier*, 356 F. Supp. 3d at 50 (quoting *Simpson II*, 470 F.3d at 360) (last three alterations in original). However, the law does not require the plaintiff to show that the hostage taker "had communicated its intended purpose to the outside world." *Simpson II*, 470 F.3d at 360.

Based on the evidence the Levinsons submitted with their motion for default judgment and presented at the evidentiary hearing, the first element of hostage taking is satisfied. For the reasons explained below, the Court finds that the Iranian government was responsible for Levinson's kidnapping.

First, the immediate circumstances of Levinson's kidnapping point to Iran. For starters, there is no evidence that Levinson left Kish; all record evidence suggests that he was abducted while in Iran. *See* Gritz Hrg. Tr. 148:12–14. And because Iran is a "totalitarian" state which "totally controls the behavior . . . the livelihood and the lives of . . . those who are confined to its borders," Gabbay Hrg. Tr. 22:8–12, it is likely that only the Iranian regime would have had the audacity to kidnap an American—and a former American law enforcement officer at that—from

Iranian soil. *See also* Gritz Hrg. Tr. 149:15–150:4 (explaining that the Islamic Revolutionary Guard Corps (IRGC), a military and intelligence arm of the Iranian regime, has a presence on Kish). Moreover, the subject of Levinson's investigation—corruption within the Iranian regime—provided at least one reason for Iran to kidnap Levinson. There is no evidence in the record that any other country or organization had a similar reason to do so at the time.

Second, the Press TV article weighs strongly in favor of Iran's responsibility for Levinson's kidnapping. According to the article, Levinson was "in the hands of Iranian security forces since the early hours of March 9." ECF No. 37-5 at 1. All three experts opined that Press TV, as a functional arm of the Iranian government, would not publish such an article without approval or direction from the government, and would not report that Levinson was in the hands of Iranian security forces unless it were true. *See* Gritz Hrg. Tr. 155:18–160:3; Gabbay Hrg. Tr. 19:10–20:18; Clawson Hrg. Tr. 123:10–125:3.[9] Further, Dr. Clawson testified that it would have been "unprecedented" for Press TV to report falsely that Levinson was in the custody of Iranian security forces. Clawson Hrg. Tr. 124:15–125:3.

Third, the 2011 meeting between Eshel and Ambassador Miraboutalebi powerfully suggests that Levinson remained detained—even years later—by Iran. Ambassador Miraboutalebi tried to negotiate the delay of a forthcoming IAEA report by leveraging the possibility that Iran might free Levinson. And Eshel testified that he was left with "no doubt as to the fact that Mr. Levinson was under the control of the Iranians" and—although Eshel had no

---

[9] The Court admitted the Press TV article as an opposing party's statement, given the expert testimony that Press TV is a functional arm of the Iranian government. *See* Fed. R. Evid. 801(d)(2)(C). And even if the article had not been admitted into evidence, the experts could have still relied on it to conclude that Iran was responsible for Levinson's kidnapping. *See* Fed. R. Evid. 703.

prior knowledge of Levinson's case—it was "one hundred percent clear" to him in the context of the meeting that Iran controlled Levinson's fate. Eshel Hrg. Tr. 11:2–6, 11:23–12:9.[10]

Fourth, each expert testified, based on their background and experience, the above evidence, and other evidence of the type that experts in their fields reasonably rely on, that Iran was responsible for Levinson's kidnapping. *See* Gritz Hrg. Tr. 139:22–140:2, 162:18–163:1, 170:6–17; Gabbay Hrg. Tr. 19:24–21:1; Clawson Hrg. Tr. 124:15–129:7, 135:2–141:5. The Court credits the persuasive testimony of these experts on this point.

Gritz testified that Iran's Islamic Revolutionary Guard Corps (IRGC) was likely responsible. Gritz Hrg. Tr. 162:18–163:1.[11] And she based that opinion in part on her experience supervising the FBI's investigation into Levinson's kidnapping from 2007 to 2009. In that role, for example, she learned about an email that the Levinson family received in 2008, purportedly from a medical technician in Iran who had treated Levinson. *Id.* 151:12–14, 152:2–

---

[10] The Court also received testimony about a November 2008 meeting in Cyprus intended to secure Levinson's release. Silverman Hrg. Tr. 78:10–81:3, 83:17–85:14; Dobbs Hrg. Tr. 88:14–89:13; 98:18–103:25. At this meeting, the Iranian regime was allegedly represented by an agent of Hezbollah, a terrorist group funded and controlled by Iran. *See Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 44 (D.D.C. 2008) (discussing the "symbiotic" relationship between Hezbollah and Iran). But the admissibility of the evidence presented at the hearing linking the meeting's participants to Hezbollah was questionable at best. The Court therefore does not, and need not, rely on any testimony or evidence related to this meeting in finding Iran responsible for Levinson's abduction.

[11] The IRGC is the military component of Iran's revolutionary institutions, established as a defender of not just Iran, but its 1979 Revolution. Clawson Decl. ¶¶ 30–33, 37, 39. It exercises substantial influence within the Iranian government. *Id.* ¶ 40. The IRGC also undertakes intelligence functions and has the power to detain and interrogate persons. *Nikbin v. Islamic Republic of Iran*, 517 F. Supp. 2d 416, 423 (D.D.C. 2007). For FSIA purposes, the IRGC is part of the Iranian government. *See Fritz*, 320 F. Supp. 3d at 76 n.12.

8. She and the FBI found the email credible.[12]  *Id.* 152:9–154:21.  Gritz also was aware of an occasion when the United States was close to successfully negotiating for Levinson's release, and a plane was positioned in Iran to fly Levinson out of the country.[13]  *Id.* 161:12–22.  In summary, Gritz testified, the relevant components of the United States government, including the National Security Council's Hostage and Personnel Recovery Working Group, all concluded based on the available evidence that Iran was responsible for Levinson's kidnapping and detention.[14]  ECF No. 37-18 (Gritz Decl.) ¶ 5; Gritz Hrg. Tr. 140:11–25; *see also id.* 143:1–12 (testifying that the United States government undertook operational activity based on the conclusion that Iran was responsible for Levinson's kidnapping).  Indeed, as late as last year, the FBI publicly confirmed that "the only credible evidence of responsibility in Mr. Levinson's abduction has pointed to those working for the government of the Islamic Republic of Iran."  FBI Statement on 12th Anniversary of the Abduction of Robert A. Levinson, March 8, 2019,

---

[12] Gritz may base her opinion on "facts or data in the case that [she] . . . has personally observed."  *See* Fed. R. Evid. 703.

[13] Gritz may base her opinion on hearsay or otherwise inadmissible evidence if other experts in that field would reasonably rely on that kind of evidence.  *See* Fed. R. Evid. 703; *Owens*, 864 F.3d at 789.  "Further, the expert may disclose to the factfinder otherwise inadmissible 'underlying facts or data as a preliminary to the giving of an expert opinion.'"  *Owens*, 864 F.3d at 789 (quoting Fed. R. Evid. 705).  The Court recounts the additional information above solely "to explain why it admitted and credited" Gritz's opinion.  *Id.* at 790.

[14] Gritz further testified that even if she based her opinion solely on the facts discussed in open court at the hearing—ignoring any classified or other evidence known to her but not in the record—she would still conclude that Iran was responsible.  Gritz Hrg. Tr. 170:6–17.  The Court notes, though, that Gritz's assurance on this point is unnecessary.  An expert may state her opinion and give reasons for it "without first testifying to the underlying facts or data."  Fed. R. Evid. 705.  For that reason, it is of no moment that Gritz's opinion may be based in part on evidence that is not in the record.  Although an expert may have to disclose the facts or data underlying her opinion on cross-examination, by failing to appear in this case Iran forfeited its opportunity to cross-examine her.

https://www.fbi.gov/contact-us/field-offices/washingtondc/news/press-releases/fbi-statement-on-12th-anniversary-of-the-abduction-of-robert-a-levinson.[15]

Dr. Gabbay similarly concluded that Levinson was abducted by Iran, based on the Press TV article, the meeting between Eshel and Ambassador Miraboutalebi, the video and photographs received by Levinson's family, and his own knowledge and experience. Gabbay Hrg. Tr. 19:24–21:1. And Dr. Clawson testified that he had "no doubt" that Iran was responsible. Clawson Hrg. Tr. 141:1–5. He based his opinion on the above evidence, and especially the FBI's statement last year. *Id.* 137:18–139:11. Dr. Clawson explained that he gave that statement "considerable weight" because historically, the FBI has been "extremely cautious" about attributing such acts to foreign governments. *Id.* 139:4, 139:11.[16] Dr. Clawson also based his conclusion on his knowledge that the Iranian regime commonly takes hostages, *see* Clawson Hrg. Tr. 131:18–137:17.[17]

---

[15] The Court takes judicial notice of this statement on the FBI's website under Federal Rule of Evidence 201(b). *See Detroit Int'l Bridge Co. v. Gov't of Can.*, 133 F. Supp. 3d 70, 85 (D.D.C. 2015) ("[J]udicial notice may be taken of public records and government documents available from reliable sources."); *Pharm. Research & Mfrs. of Am. v. United States Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies.").

[16] Dr. Clawson also relied in part on a July 15, 2019 statement by the Iranian government in a report by the United Nations Working Group on Arbitrary Detention that "Mr. Robert Alan Levinson has an ongoing case in the Public Prosecution and Revolutionary Court of Iran." Clawson Hrg. Tr. 128:16–130:4; Clawson Ex. 5 at 8. He explained that because the Revolutionary Courts hear crimes against the Iranian Revolution—essentially, political crimes, such as espionage—it made sense that someone like Levinson detained by the Iranian government would be tried there. *See* Clawson Hrg. Tr. 129:8–130:3, 146:14–16.

[17] This District's docket confirms Dr. Clawson's conclusion that Iran routinely takes hostages. *See, e.g.*, *Rezaian v. Islamic Republic of Iran*, Civil Case No. 16-1960 (RJL), 2019 WL 6253046, at *6–7 (D.D.C. Nov. 22, 2019); *Abedini v. Gov't of Islamic Republic of Iran*, Civil Action No. 18-588 (JEB), 2019 WL 5960545, at *4–5 (D.D.C. Nov. 13, 2019); *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 161–62 (D.D.C. 2017).

Finally, despite Iran's apparent denials of responsibility for Levinson's abduction, there are no other plausible explanations in the record for what happened to him. According to Gritz, the FBI found no credible evidence that Levinson was kidnapped by Pakistan or another country. Gritz Hrg. Tr. 148:15–149:14; *see also id.* (rejecting theory that Levinson may have decided to disappear). Likewise, there is no credible evidence in the record that Levinson was kidnapped by a non-state actor, such as a transnational terrorist or criminal organization. At first glance, the video and photographs received by Levinson's family could suggest that he was abducted by a terrorist organization. But Gritz testified that in her view, they point to the opposite conclusion. According to Gritz, the video has the hallmarks of a "more sophisticated" actor—such as a state sponsor of terrorism—looking to increase its leverage in a deal to recover Levinson. *Id.* 132:19–133:22. As she explained, if Levinson had been kidnapped by a nonstate terrorist organization, the video would have more likely depicted Levinson's execution, because those organizations are more interested in inciting fear and provoking outrage than in dealmaking.[18] *Id.* 132:25–133:3. Similarly, she testified, the failure of any non-state terrorist organization to claim responsibility publicly for Levinson's abduction reflects the improbability that his captors fall into that category. Nation-states, she explained, take a longer-term view, and typically wait until an opportune moment to announce publicly that they have a hostage, if they ever do; on the other hand, terrorist groups tend to take immediate public responsibility for their actions. *Id.* 133:20–134:14.

The other experts also found no credible alternative explanation for what happened to Levinson. Dr. Gabbay testified that he gave no weight to Iran's contradictory and implausible

---

[18] Levinson's son Daniel also theorized that the video was intended by Iran to give it a cover story, shortly after he and his brother Douglas approached Iranian officials at the United Nations and accused them of holding their father hostage. Daniel Hrg. Tr. 224:14–225:20.

denials of responsibility, noting that the regime has also denied the existence of its secret prisons, its use of torture, and its nuclear weapons program. Gabbay Hrg. Tr. 30:14–32:23. Based on the evidence and his own expertise, he had "no doubt" that "the Iranian government is lying in this case." *Id.* 32:5–6. And similarly, Dr. Clawson testified that there was no evidence to suggest that Levinson was kidnapped by any entity other than the government of Iran—including dissident political groups or criminal organizations—and that non-state kidnappings in Iran are uncommon. Clawson Hrg. Tr. 139:21–140:25. In summary, he testified, no alternative scenario was "at all credible." *Id.* 140:6.

The Court also finds that the second element of hostage taking is satisfied, because the Levinsons have shown that Iran intended, at least in part, to use Levinson to extract concessions from and gain leverage over the United States. *See Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 46 (D.D.C. 2019) ("Political leverage in the context of a country's relationship with the United States is a sufficiently coercive purpose to establish hostage-taking."); *see also Warmbier*, 356 F. Supp. 3d at 50. The Court so concludes for several reasons.

First, Gritz persuasively interpreted the Press TV article as the start of Iran's negotiation over the price of Levinson's release. Gritz Hrg. Tr. 160:4–10. Her conclusion was based, in part, on the article's reporting that Levinson's situation had been "complicated by the mounting tensions stemming from repeated American threats against Iran, actual ongoing covert actions within Iran run by the Americans and the particulars of the man's background with the FBI." ECF No. 37-5. Second, Iran's Ambassador Miraboutalebi *did* try to use Levinson as leverage to induce the United States to delay publication of an IAEA report. Third, both Dr. Gabbay and Dr. Clawson offered their persuasive views, based on their knowledge and experience, that Iran

intended to use Levinson as a "negotiating" or "bargaining" chip in conflicts with the United States. Gabbay Hrg. Tr. 35:9, 38:19–40:24; Clawson Hrg. Tr. 135:8–137:17.[19]

For these reasons, the Court concludes that Iran's kidnapping of Levinson qualifies as a hostage taking.

### b.    Torture

The FSIA's definition of torture is also imported from another body of law, in this case the Torture Victim Protection Act. 28 U.S.C. § 1605A(h)(7). Under that statute,

(1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;
(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
(C) the threat of imminent death; or
(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

---

[19] The docket of this District also confirms that kidnapping Americans for similar bargaining purposes is a common modus operandi of the Iranian regime. *See, e.g.*, *Rezaian v. Islamic Republic of Iran*, 2019 WL 6253046, at *6–7; *Abedini v. Government of Islamic Republic of Iran*, 2019 WL 5960545, at *4–5; *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d at 161–62.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992), *codified at* 28 U.S.C. § 1350 (note). In cases such as Levinson's, where a hostage has not been released from captivity, there is often little direct evidence about precisely how he was treated by his abductors. But this Circuit has held that in such cases—and when the hostage-takers have not appeared to answer for their conduct—the Court may infer that a victim was tortured from "compelling, admissible evidence" that the regime at issue routinely tortures its prisoners. *Han Kim*, 774 F.3d at 1049; *see id.* at 1048 ("This is especially true in cases of forced disappearance, like this one, where direct evidence of subsequent torture and execution will, by definition, almost always be unavailable, even though indirect evidence may be overwhelming."); *see also Owens*, 864 F.3d at 787–89.

Based on the evidence the Levinsons submitted with their motion and presented at the hearing, the Court finds it more likely than not that the Iranian government tortured Levinson at some point since it took him hostage.

The evidence in this case includes both direct evidence of Levinson's condition suggesting he was tortured and "compelling evidence" that Iran routinely tortures its hostages. In the video that surfaced three years after his kidnapping, Levinson appears to have lost significant weight and hair, and appears malnourished. Christine Hrg. Tr. 111:16–112:2. In fact, he says that he is "not in very good health" and is "running very quickly out of diabetes medicine." Ex. 6a; *see also Rezaian v. Islamic Republic of Iran*, Civil Case No. 16-1960 (RJL), 2019 WL 6253046 at *2 (D.D.C. 2019) (finding that Iran tortured a prisoner where, among other things, it "failed to give him blood pressure medication that he had been prescribed since high school"). And he appears to be wearing his own ragged and torn white polo shirt, suggesting that he may not have changed clothes for three years. Christine Hrg. Tr. 100:17–101:7. The

next year, in the five photographs received by his family, Levinson is almost unrecognizable, with long hair and an unkempt beard, suggesting that he may not have been allowed to groom himself for some time. Considered together, the video and photographs provide some evidence that Levinson was subjected to unsanitary conditions and received inadequate medical treatment, which can constitute torture. *See, e.g.*, *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 160–61 (D.D.C. 2017); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 152 (D.D.C. 2010).[20]

But it is Dr. Gabbay's testimony about Iran's practices that is ultimately the most convincing proof to the Court on this point. Dr. Gabbay testified that Iran routinely tortures its prisoners. He highlighted case studies and reports from well-known human rights organizations describing Iran's use of torture. Gabbay Hrg. Tr. 21:23–28:23. He described examples in which the Iranian regime beat prisoners, as well as a specific case in which it subjected one to a mock execution while forcing him to watch actual executions of other prisoners. *Id.* 23:8–26:7; *see Kilburn*, 699 F. Supp. 2d at 152 (stating that beatings and mock executions are torture). Dr. Gabbay opined that it is "highly likely" that Levinson was tortured by Iran, and "reasonably likely" that he has been subjected to certain specific conditions, including prolonged solitary confinement, inadequate food, unsanitary conditions, forcible interrogation, and deprivation of appropriate medical care. Gabbay Hrg. Tr. 28:24–29:24; *see Kilburn*, 699 F. Supp. 2d at 152

---

[20] Levinson's statement in the video that he was being "treated well" does not alter the Court's conclusion on this point, as the Court affords little weight to a hostage's positive characterization of his treatment while being held. Ex. 6a; *see Rezaian*, 2019 WL 6253046, at *3.

(stating that unsanitary conditions and inadequate food and medical care constitute torture); *Rezaian*, 2019 WL 6253046, at *7.[21]

Dr. Gabbay also testified that Levinson's background as a former Special Agent with the FBI and DEA and his status as a prisoner that Iran denies holding make it much more likely that he would be tortured than the typical Iranian prisoner.[22] Gabbay Hrg. Tr. 29:25–30:13, 33:14–37:4. He explained that Iran would have several potential purposes in torturing Levinson: first, to obtain a confession, which could be used to legitimize his abduction or increase his value as a hostage; second, to extract information from him about his work in federal law enforcement; and third, to punish and deter conduct Iran may claim was espionage. *Id.* 37:5–40:24, 43:17–46:11. Severe, intentional physical or mental pain or suffering inflicted for any of these purposes satisfies the definition of torture in section three of the TVPA. 28 U.S.C. § 1350 (note); *see also Price*, 294 F.3d at 93 (noting that the list of purposes provided in the TVPA was "not meant to be exhaustive" and was included to emphasize that "torture requires acts both intentional and malicious," and holding that similar, non-enumerated purposes would suffice to elevate an act of violence into an act of torture).

Ultimately, Dr. Gabbay concluded that based on Levinson's background, the video and photographs received by his family, and the sheer length of his detention, the likelihood that Iran tortured him was "almost one hundred percent." Gabbay Hrg. Tr. 36:5–37:4.

---

[21] The courts of this District are—unfortunately—all too familiar with Iran's use of torture. *See, e.g.*, *Rezaian v. Islamic Republic of Iran*, 2019 WL 6253046, at *6–8; *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d at 150–55, 159–61; *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d at 60–63, 66–69.

[22] Dr. Gabbay explained that because Iran denies holding Levinson, it can still choose when and with what crimes to charge him, and so it may still be trying to coerce him to confess to certain crimes. Gabbay Hrg. Tr. 34:23–35:25.

### c.    Additional Requirements

The remaining requirements for the last of the four elements of subject-matter jurisdiction are also met.  The Levinsons seek "money damages" for "personal injury" to Levinson caused by his hostage taking and torture, 28 U.S.C. § 1605A, and for economic loss and solatium.  Compl. at 9–12.  And for the reasons explained above, these injuries were caused by—and are the "reasonably foreseeable" consequences of—Iran's nefarious conduct.  *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 86 (D.D.C. 2018).

*                    *                    *

For all these reasons, the Levinsons have shown that Iran is not immune from suit for Levinson's hostage taking and torture, and that this Court has subject-matter jurisdiction over their claims under the FSIA's terrorism exception.

## B.    Personal Jurisdiction

To impose judgment on a foreign state under the FSIA, this Court must also have personal jurisdiction.  Personal jurisdiction over a foreign government turns on a showing of (1) subject-matter jurisdiction under the FSIA; and (2) proper service under the FSIA.  28 U.S.C. § 1330(b).

28 U.S.C. § 1608(a) lists four methods of serving a foreign government, in the order in which plaintiffs must attempt them:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a); *see also Fritz*, 320 F. Supp. 3d at 87 ("Section 1608(a) provides four methods of service in descending order of preference." (internal quotation marks omitted)). Because Iran does not have a special arrangement for service with the Levinsons, nor is it party to an international convention on service, the Levinsons did not need to attempt service in accordance with § 1608(a)(1) or (a)(2). *See Fritz*, 320 F. Supp. 3d at 88; *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008). The Levinsons tried to serve Iran under § 1608(a)(3) on May 18, 2018. ECF No. 24. When that failed, they started service through diplomatic channels under § 1608(a)(4) by diplomatic note forwarded by the Department of State to the American Interests Section of the Swiss Embassy in Tehran. ECF No. 33; ECF No. 39-1. The Swiss Embassy served the Iranian Ministry of Foreign Affairs on October 1, 2018. ECF No. 39-1 at 5. Although Iran refused to accept delivery, service was still proper. *See Fritz*, 320 F. Supp. 3d at 89; *Ben-Rafael*, 540 F. Supp. 2d at 52–53.

Because the Court has subject-matter jurisdiction over the Levinsons' claims, and because they properly served Iran under 28 U.S.C. § 1608(a), the Court has personal jurisdiction over Iran under 28 U.S.C. § 1330(b).

### C. Iran's Liability

Having already concluded that the Court possesses subject-matter jurisdiction, little else is required to show that the Levinsons are entitled to relief. 28 U.S.C. § 1605A(c). The private right of action in the FSIA terrorism exception provides that a foreign government is liable to a

U.S. citizen "for personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1), (c). As a result, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law" if the plaintiff is a citizen of the United States. *Fritz*, 320 F. Supp. 3d at 86–87; *see Hekmati*, 278 F. Supp. 3d at 163 ("Essentially, liability under § 1605A(c) will exist whenever the jurisdictional requirements of § 1605A(a)(1) are met.").

As already mentioned, the Levinsons are U.S. citizens. 28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22). As a result, they may rely on the cause of action in the terrorism exception to establish Iran's liability for their injuries. *See Owens*, 864 F.3d at 809. And because they have proven that the state-sponsored terrorism exception abrogates Iran's sovereign immunity and that this Court has subject-matter and personal jurisdiction over their claims, they have also shown that Iran is liable to them for the dastardly acts of taking Levinson hostage and torturing him.

## IV.    Conclusion

For all the above reasons, the Court will grant the Levinsons' Motion for Default Judgment, ECF No. 37, in a separate order. The Court will also grant their Motion to Appoint a Special Master, ECF No. 50, in a separate order.


/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 9, 2020