UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                            )
CHRISTINE LEVINSON, as conservator for      )
ROBERT LEVINSON, et al.,                              )
                                                            )
      Plaintiffs,                                        )
                                                            )
      v.                                                 )        Civil Action No.: 1:17-cv-00511 (TJK)
                                                            )
THE ISLAMIC REPUBLIC OF IRAN,              )
                                                            )
      Defendant.                                      )
_____)

## INTRODUCTION

Plaintiffs Robert Levinson, Christine Levinson, Susan Levinson Boothe, Stephanie

Levinson Curry, Sarah Levinson Moriarty, Daniel Levinson, David Levinson, Samantha

Levinson and Douglas Levinson initiated this action under the Foreign Sovereign Immunities

Act ("FSIA"), 28 U.S.C. § 1602, *et seq.*  Each seeks damages for injuries sustained as a result of

the Islamic Republic of Iran's unlawful detention and torture of Robert Levinson.  In accordance

with Federal Rule of Civil Procedure 53 and this Court's Order dated March 12, 2020, the

Special Master has reviewed testimonial and documentary evidence to assist in the formulation

and recommendation of damages.

## BACKGROUND

Robert Levinson is the longest-held American hostage in history.  He was abducted on

March 9, 2007, from Kish Island, Iran.  For the next 13 years, the Levinson family embarked on

a tireless campaign to secure his release.  Robert's wife and children traveled to the Middle East

to meet with Iranian officials.  They met on countless occasions with FBI agents and high-

ranking representatives of the U.S. government, including the President of the United States and

the Secretary of State.  The conferred with officials of the Iranian government both here and abroad.  They established a website devoted to Robert's return; corresponded and met with members of Congress; suffered the indignities of abusive and threatening e-mails; sat for countless media interviews; and endured more than a decade of denials, mixed messages, self-serving excuses, and contradictory explanations from Iranian officials and from U.S. intelligence agencies.

Particulars of Robert Levinson's case and the efforts undertaken by his family are amply detailed in the Court's Memorandum Opinion (ECF No. 67) and will not be repeated here except as relevant to assessing individual damages.

## PROCEDURAL HISTORY

On March 21, 2017, plaintiffs filed their complaint under the FSIA, seeking damages from the Islamic Republic of Iran "for injuries suffered by each of them as a result of Iran's unlawful acts of hostage taking, torture and other torts."  Complaint ¶ 1 (ECF No. 1).  On October 1, 2018, a copy of the Summons and Complaint was served on Iran and, on November 5, 2018, the Clerk of the Court acknowledged receipt of service. ECF No. 33.  When Iran failed to file an answer by the November 30, 2018 deadline, plaintiffs moved for entry of default, ECF No. 34, which the Clerk entered on December 11. ECF No. 35.

On February 18, 2019, plaintiffs moved for default judgment, ECF No. 37, and on September 5, 2019, petitioned for the appointment of a special master to review their claims and recommend damages.  ECF No. 50.  An evidentiary hearing was convened on December 4 and 5, 2019.  On March 9, 2020, the Court granted plaintiffs' Motion for Default Judgment, ECF Nos. 66 and 67, and three days later, appointed the undersigned to "receive evidence, and to prepare

proposed findings and recommendations for the disposition of plaintiffs' claims for compensatory damages in this matter."  ECF No. 68.

## TESTIMONY

### Robert Levinson

Robert Levinson's continued incarceration has made it impossible for him to provide direct testimony attesting to his physical and mental health or to the conditions under which he has lived as a captive in Iran.  This Court, nonetheless, found both "direct evidence of Levinson's condition suggesting he was tortured and 'compelling evidence' that Iran routinely tortures its hostages."  Memorandum Opinion at 20.

The Court concluded that a video received by the Levinsons in November 2010 and five photographs they received in April 2011, provide "some evidence that Levinson was subjected to unsanitary conditions and received inadequate medical treatment, which can constitute torture." *Id.* at 21.  The video shows Robert appearing haggard and malnourished, saying he was "not in very good health," was "running very quickly out of diabetes medicine," and begging the U.S. government to intervene on his behalf.  Memorandum Opinion at 4 (quoting Christine Hrg. Tr. 111:16–25). The photographs show Robert with long hair and a scraggly beard, dressed in an orange jumpsuit, draped in chains, and holding placards asking for help.  *Id.*

The Court found the "most convincing proof," of Robert's mistreatment came from expert opinion of Dr. Shaul M. Gabbay, the Director of the Global Research Institute at the Posner Center for International Development.  Dr. Gabbay confirmed that "Iran routinely tortures its prisoners," and cited examples where "the Iranian regime beat prisoners," including one instance where a prisoner was subjected to a "mock execution" and forced "to watch actual executions of other prisoners."  Memorandum Opinion at 21 (citing Gabbay Hrg. Tr. 21:23–

28:23).  Dr. Gabbay opined that it was "highly likely" Mr. Levinson was tortured by Iran, and

"reasonably likely" that he endured "prolonged solitary confinement, inadequate food, unsanitary

conditions, forcible interrogation, and deprivation of appropriate medical care."  Memorandum

Opinion at 21 (quoting Gabbay Hrg. Tr. 28:24–2 9:24).  Dr. Gabbay proffered that Mr.

Levinson's "background as a former Special Agent with the FBI and DEA and his status as a

prisoner that Iran denies holding make it much more likely that he would be tortured than the

typical Iranian prisoner."  Memorandum Opinion at 22 (citing Gabbay Hrg. Tr. 29:25–30:13,

33:14–37:4 (footnote omitted).  After weighing the evidence, the Court concurred with Dr.

Gabbay's conclusion that, based on Robert Levinson's "background, the video and photographs

received by his family, and the sheer length of his detention, the "likelihood that Iran tortured

him was 'almost one hundred percent.'"  *Id.* (quoting Gabbay Hrg. Tr. 36:5–37:4).

### **Testimony of Christine Levinson—Robert Levinson's Spouse**

Christine Levinson provided her testimony in a declaration dated February 11, 2019

("CL-Decl.").  On March 9, 2017, the Circuit Court of the Seventeenth Judicial District in and

for Broward County, Florida, appointed Christine as conservator for her husband, Robert

Levinson, "with full power to exercise all delegable legal rights and powers of the absentee

pursuant to Fla. Stat. Ch. 747."  CL-Decl. at ¶ 3; CL-Exhibit 1 (Letter of Conservatorship).

Christine and Robert Levinson were married on May 11, 1974.  CL-Decl. at ¶ 2.

Together, they have seven children—Susan Levinson Boothe, Stephanie Curry, Sarah Moriarty,

Samantha Levinson, Daniel Levinson, David Levinson, and Douglas Levinson—all of whom are

claimants.  *Id*.

According to Christine, Robert was employed as an agent for the FBI until he retired in

1998.  CL-Decl. at ¶ 3.  After his retirement, he worked as a "private investigator doing mostly

high-level international investigations," during which time his income, "including his FBI retirement, varied from a low of $84,475 to a high of $228,852." *Id*.  Christine estimated that, from 2003 until his disappearance on March 9, 2007, Robert's "annual income," "[n]ot counting his pension," was "a little more than $100,000 a year." *Id*.

Christine describes her family as "very close-knit and loving," and Robert, as a "loving and attentive husband and father," whose disappearance has been a "tremendous blow."  CL-Decl. at ¶ 4.  Since Robert's abduction, Christine has agonized knowing her husband was being held "by a hostile regime [that] routinely tortures its prisoners."  *Id*.  She has had repeated nightmares, in which she visualizes her husband being tortured.  *Id*.  Christine notes that the family's "shared grief" over Robert's abduction has been exacerbated by the "constant barrage of reports of people who were tortured or killed by Iran."  *Id*.

In late February or early March 2007, Robert informed Christine of his plan to take a business trip to the Middle East to interview a potential witness.  CL-Decl. at ¶ 5.  A few days after he left, Christine received a telephone call from Robert's friend, Ira Silverman, expressing concern that he had not heard from Robert since he left Dubai for Kish Island to meet his witness.  *Id*.  Mr. Silverman contacted Christine a "few days" later, and told her that, after speaking to the intended witness, he believed Iranian authorities might have detained Robert.  *Id*.  Not having heard directly from Robert, Christine became frightened and anxious.  *Id*.

On April 3, 2007, an Iranian government news organization published a story that Robert "was in the hands of Iranian security forces" and would be "freed in a matter of days."  CL-Decl. at ¶ 5; CL-Exhibit 4 (news article).  When Robert was not released, the Levinson family created a website requesting any information about Robert's situation.  *Id.*  One year later, in April 2008, "an Iranian medical technician with knowledge of Bob's whereabouts," posted a statement on the

Levinson website, that "Bob was being held by the Iranian 'Department of Intelligence' in a small town in southwest Iran," and that she had spoken to Robert "when intelligence officers brought him to her hospital with a medical emergency at 3:00 in the morning." *Id*.; CL-Exhibit 17 (e-mail). Both Christine and the FBI believed the posting to be accurate. *Id*. For "the next several years," however, the family received little additional information. *Id*.

Christine attested to the efforts undertaken by her "entire family" to secure her husband's release. CL-Decl. at ¶ 4. Besides meeting with Iranian officials, including the country's ambassador to the United States, the family pleaded its case to the FBI, the Secretary of State, and the President of the United States. CL-Decl. at ¶ 4. Adding to the family's unease was the fact that Iranian officials denied any knowledge of "Robert's status or whereabouts," while simultaneously entertaining "backchannel offers to release Robert in exchange for concessions by the United States." *Id*. In December 2007, Christine and her son, Daniel, traveled to Iran and Kish Island and met with representatives of the Iranian government, who responded "evasive[ly]" to their inquiries. CL-Decl. at ¶ 6. Christine, nonetheless, was able to verify Robert's presence on Kish Island, from his signature in the Hotel Maryam's guest registration book. *Id.*

Christine recounts how the family's grief was compounded further by the repeated threats they received from individuals alleging they were holding Robert. CL-Decl. at ¶ 4. One e-mail, dated August 6, 2007, was addressed to Christine and to Robert's friends and colleagues, and purported to have been written by her husband. *Id.* In it, Robert "pleads for help," and "in poor English," states he is being "held by a group opposed to U.S. policies." *Id*.; CL-Exhibit 16 (e-mail). Christine immediately recognized the message was not from her husband and suspected it "was designed by Iran to create the false impression that Robert was being held by some entity

other than Iran." *Id*. at ¶ 4. The family received another e-mail in November 2010, threatening Robert's life if specific demands were not met. *Id*. A video attached to this correspondence showed Robert "pleading for help in a quivering voice." *Id*.; CL-Exhibit 6a (video). The family responded by expressing their willingness to comply with the demands and asking for additional information. *Id*. They received no further communications from the sender. *Id*. Another e-mail, sent in April 2011, included five photographs of Robert dressed in an orange jumpsuit, "disheveled, weak, and bound in chains," and displaying a "written message begging for help." *Id*. at ¶ 4; CL-Exhibits 7; 7a-7e (e-mail and attachments). Christine finds it "difficult to put into words the anguish and trauma these events have caused [her] and [her] family." *Id*.

In the summer of 2010, Christine and her daughters Susan, Sarah, and Samantha traveled to New York and met with Iran's U.N. ambassador, who denied knowledge of Robert's abduction. CL-Decl. at ¶ 7. More than two years later, in September 2012, then-president of Iran Mahmoud Ahmadinejad, in an interview with an American media outlet, similarly "denied any knowledge of Bob, while adding that he thought the matter had been resolved." *Id*. And in a September 2013 interview with CNN, Iran president Hassan Rouhani again "denied any knowledge of Bob's status." *Id*. That month, President Obama pleaded with President Rouhani for Robert's return, to no avail. *Id*. In December 2013, the witness Robert met at Kish Island told the Christian Science Monitor that he and Robert had "been detained by Iranian police on March 9, 2007." *Id*. In February 2016, the U.S. Senate passed S. Res. 99, officially recognizing Robert "as America's longest-held hostage and urging Iran to render assistance in free him." CL-Decl. at ¶¶ 7-8; CL-Exhibit 5a (Senate Resolution). And in November 2016, the United Nations declared Robert's detention a violation of human rights and urged Iran to release him. *Id.* at ¶ 7.

For Christine, "[t]he anguish of knowing what is happening to Bob, without the ability to help, is something that is very real but difficult to put into words." CL-Decl. at ¶ 10. She consistently has been "frustrated" by her inability to secure Robert's release and notes how her anguish over his absence becomes particularly acute during family occasions, such as birthdays, weddings, and graduations. *Id.*

### **Testimony of Susan Levinson Boothe—Robert Levinson's Daughter**

Susan Levinson Boothe provided her testimony in a declaration dated February 18, 2019 ("SLB-Decl.").

Susan was 29 when her father was abducted. SLB-Decl. at ¶¶ 1-2. She describes her father as "the epitome of what a dad should be" and "the greatest man [she has] ever known." *Id.* at ¶ 3. According to Susan, Robert "loved unconditionally, gave generously, and treated everyone with respect and kindness." *Id.* She laments how the passage of time since his abduction in 2007 has not "eased the pain of the situation," and wonders "every day if her father is suffering, getting enough food, and whether she will see him again." *Id.*

In 2007, Susan was living in Florida with her parents and two siblings. SLB-Decl. at ¶ 4. At the time, she was employed as a reserve flight attendant. *Id.* Susan recounts how, before her father embarked on his trip to Iran, the family discussed how unhappy Susan was with her career and how Robert offered to pay for a "GRE Class and Exam" if she wanted "to pursue grad school." *Id.*

Although her father had already left to go to Iran, Susan anticipated hearing from him on his birthday—Saturday, March 10, 2007. SLB-Decl. at ¶ 4. By late afternoon that day, she noticed her mother "acting strangely and evasive," refusing to respond to Susan's questions whether anything was wrong. *Id.* At one point, Susan contacted Robert's friend and asked him

to tell her what was going on.  He demurred, saying he first had to speak to her mother about Robert's "situation." *Id*.  It was then, Susan "knew something terrible happened." *Id*.  She next telephoned a family friend, Ira Silverman, who confirmed her father was missing. *Id*.  Susan became "hysterical, inconsolable and scared." *Id*.  She broke the news, first to her brother David, who was home from college, and then to two of her sisters.  *Id*.  They were "inconsolable, confused, shocked and terrified." *Id*.  Susan "will never forget those conversations for the rest of [her] life." *Id*.  Susan, David, and their mother collectively told Doug and Samantha, and then contacted Daniel, who was in China.  *Id*.

Susan took a leave of absence from work and, for the next eight months, lived at home. SLB-Decl. at ¶ 4.  She "barely got out of bed," suffered from "horrible insomnia," and was diagnosed as "clinically depressed." *Id*.  In the years that followed, Susan "self-medicated with alcohol and cigarettes," and "turned to emotional eating." *Id*.  To this day, Susan takes "a heavy dose of anti-depressants and sleeping pills" and has repeated nightmares of her father dying. *Id*.

For Susan, the anguish over her father's disappearance "has never gone away."  SLB-Decl. at ¶ 5.  Her sense of loss is particularly profound during "life's big and important events, both good and bad," such as births, weddings, illnesses, and hospitalizations. *Id*.  Her pain "has never healed and goes on today."  SLB-Decl. at ¶ 6.  Hearing accounts of torture inflicted on other Iranian prisoners makes Susan even more fearful for her father's safety. *Id*.  Susan describes how her family has advocated for her father's release, and how she has participated in meetings with American and Iranian officials. *Id*.  She recalls one meeting with Iran's ambassador to the U.N., in which she sobbed and begged him to intervene. *Id*.  The ambassador became angry, threatened to cancel the meeting, admonished Susan to be strong, and suggested

she ask the FBI "why they sent him to Iran." *Id.*  Susan quickly realized the ambassador's response was nothing more than a self-serving "attempt[] to justify" Iran's actions.  *Id.*

In November 2010, Susan's family received a video of her father in which he appeared "thinner," "his hairline [] receding," "haggard and sad."  SLB-Decl. at ¶ 7.  As "excruciating" as the video was to watch, Susan viewed it many times just to see and hear her father.  *Id.*  In the spring of 2011, the family received photographs of her father draped in chains and wearing a prison-style jumpsuit.  Susan found these pictures "tough to view." *Id*.

Susan recounts how her mother developed into a "fighter" and, as a single parent, raised two underage children and "got all seven" children through college.  SLB-Decl. at ¶ 8.  Susan describes her mother as "my dad's most fervent fighter," who will never give up.  *Id.*

**<u>Testimony of Stephanie Levinson Curry—Robert Levinson's Daughter</u>**

Stephanie Levinson Curry provided her testimony in a declaration dated April 19, 2018 ("SLC-Decl.").

Stephanie was 28 when her father was kidnapped.  SLC-Decl. at ¶ 2.  She describes her family as "close and loving," and her father, as a man "devoted to his children" who "played a large role" in their lives.  *Id*. at ¶ 3.  Stephanie recounts how Robert offered to support her financially so she could quit her job and care for her ailing infant son.  *Id.*  She recalls their last conversation, during which her father tried to console her about her son's medical condition.  *Id*.  According to Stephanie, he "comforted me in a way that only someone special in your life can do." *Id.*

When Stephanie learned her father had been abducted, she began "sobbing and shaking." SLC-Decl. at ¶ 4.  During the first year, she lost 35 pounds from grief and worry.  *Id*.  To this day, Stephanie finds it "difficult to express in words" her "pain and grief" over her father's

absence, and constantly confronts the reality of her father incarcerated by a "hostile power that routinely tortures its prisoners." *Id*.  In 2011, when a video of her father was released, Stephanie "became hopeful."  When her "hopes were again dashed," she became "angry at the world."  *Id*. She believes, "[n]o one should have to feel that type of pain, as the pain of repeatedly being given hope only to have those hopes dashed is extraordinary." *Id*.  Stephanie fell into a "depression that lasted several years," during which she experienced "a relapse of an autoimmune medical condition that was stress-induced." *Id*.

Stephanie's entire family "worked tirelessly" to bring about her father's release.  SLC-Decl. at ¶ 5.  They continually monitored and managed social media accounts, and Stephanie has been "heavily involved in countless meetings with government officials." *Id*.  She describes her efforts as "necessary," but "emotionally draining." *Id*.

Like her siblings, Stephanie describes the strain Robert's abduction has had on her mother, who "lost the love and support of her husband" of forty-plus years.  SLC-Decl. at ¶ 5. She notes how her mother became Robert's "very public advocate," and has been forced to confront "her own very serious medical crises without him." From Stephanie's perspective, her father's disappearance "has visibly weighed on [her] mother and has aged her more rapidly than most people." *Id*.

### **Testimony of Sarah Levinson Moriarty—Robert Levinson's Daughter**

Sarah Moriarty provided her testimony in a declaration dated April 9, 2018 ("SLM-Decl.").

Sarah was 26 when her father was abducted.  SLM-Decl. at ¶ 2.  She describes growing up in a "close and loving" family with a "wonderful father" who was "deeply involved" in his children's lives. *Id*. at ¶ 3.

Robert's disappearance has been "traumatic."  SLM-Decl. at ¶ 4.  She recounts how her family has experienced "the pain of seeing horrific pictures and video" of Robert, "looking sick and gaunt, haggard and tormented," while keenly aware of Iran's reputed barbaric treatment of its prisoners.  *Id.*  This knowledge "haunts" Sarah and her family.  *Id.*

Since her father's abduction, Sarah has experienced "physical pain" and "repeated panic attacks."  SLM-Decl. at ¶ 5.  Her doctor diagnosed her condition as "stress-induced," and Sarah has "been in therapy for six years to deal with these problems."  *Id.*  Due to her "extreme stress," Sarah "needed medical assistance" to deliver her second child.  *Id.*  She frequently has nightmares of her father trying to contact her.  *Id.*  Sarah has also experienced "problems at work" due both to her "stress" and to the demands placed on her time advocating on her father's behalf.  *Id.*  At one point she "risked" losing her job when she stayed home with her younger siblings while her mother and brother traveled to Iran.  *Id.*

Sarah describes how her once-quiet family has been thrust "into the spotlight."  She recalls  sitting for countless interviews that required "constant preparation" to ensure nothing would be said that might jeopardize her father's safe return.  SLM-Decl. at ¶ 6.  Like her siblings, Sarah has been the target of online "abuse," and has been compelled to respond to the many false tips the family received.  *Id.*  Sarah has corresponded with and met dozens of officials and experts, including Iran's ambassador to the U.N., then-Secretary of State John Kerry, and then-United States Ambassador to the United Nations, Samantha Power.  *Id.*  She has written countless op-ed articles and "letters to the editor," and has corresponded regularly with U.N. officials on her father's behalf.  She and her family have visited "numerous members of Congress almost yearly."  *Id.*  These sustained efforts have only intensified her "pain," preventing her from "resolv[ing] or properly process[ing]" her anguish.  *Id.*  Advocating for her

father's freedom has "strain[ed]" Sarah's own family, whose needs are often overlooked.  *Id*. at ¶ 7.  She admits being unable "to give [her] husband or two sons the proper attention they deserve," as she is "so impacted emotionally and sometimes physically."  *Id*.

Sarah laments the "pain and constant disappointment" her mother has faced since Robert disappeared.  SML at ¶ 8.  She recounts how Christine "traveled to Iran," met "with high-ranking Iranian officials," as well as "our president and the secretary of state," and how her mother "has done this over and over and over again" as "administrations keep changing."  To Sarah, there "is no end in sight—there is always a new person [her mother] needs to convince that returning [Robert] home to us should be a top priority."  *Id*.

### **Testimony of Daniel J. Levinson—Robert Levinson's Son**

Daniel J. Levinson provided his testimony in a declaration dated February 14, 2019 ("DJL-Decl.").

Daniel was 21 when his father was kidnapped.  DJL-Decl. at ¶¶ 1-3.  In their last e-mail exchange, Robert congratulated Daniel on being accepted to law school.  DJL-Decl. at ¶ 4.  When Daniel received the school's acceptance package, he discovered he had been awarded a scholarship.  He immediately attempted to contact Robert, who was traveling, to tell him the good news.  *Id*.  Daniel discovered the following day his father had been kidnapped.  *Id*.

Daniel continued with his plans to study law but was unable to focus during the first semester.  DJL-Decl. at ¶ 4.  Instead of completing his class assignments, he studied Farsi, hoping it would "prove fruitful in future interactions with Iranian officials."  *Id*.  Daniel wrote letters to foreign government leaders and to international organizations and traveled with his mother to Iran.  *Id*.  His grades suffered to the point he risked losing his scholarship.  *Id*.  Faced

with the decision whether to devote more time to classwork or to assist the family in its efforts to release his father, Daniel dropped out of law school.  *Id*.

Daniel believed, given Iran's "male-dominated culture," he had "no choice but to take the lead in many family interactions" with the Iranian government.  DJL-Decl. at ¶ 4.  He recalls a trip with his mother to Iran and recounts how they were "subject[ed] to intense scrutiny and watched closely."  *Id*.  That trip was his mother's first overseas, and they both experienced a "high level of stress no one should be subjected to."  *Id*.

In his father's absence, Daniel "had to be strong" for his siblings, and he often endured "long, emotional discussions" when one would "call crying in the middle of the night."  *Id*.  Daniel's doctor cautioned him to "work extra hard" to prevent stress from detrimentally affecting his health.  *Id*.  Daniel, nonetheless, "gained a significant amount of weight," saw his "blood pressure [] increase[] to concerning levels," and became increasingly "irritable, uptight, and temperamental."  *Id*.  As a result, he has had difficulty forming close relationships, which "put a strain" on his "close-knit family."  *Id*.

Daniel finds it "hard to carry on" knowing his father, the man he "loves more than anything in the world[,] is "being held against his will," and "tortured emotionally and physically . . .without the ability to communicate with anyone he knows and loves."  DJL-Decl. at ¶ 4.  Daniel "spontaneously breaks down in tears," and often finds it "difficult to feel any type of emotion, good or bad."  *Id*.

The "stress of high-level meetings in Washington, D.C." coupled with the demands of "conducting dozens of media interviews" and fear he might say the "wrong thing," has "dominated" Daniel's life.  DJL-Decl. at ¶ 4.  He eventually took a job with flexible work hours that allowed him to spend more time with his mother who, had "grown tired and weary over the

years" and "downtrodden and beaten." *Id.* Daniel observed his mother's health deteriorate over time and her optimism transform into desperation and defeat. *Id.*

In February 2016, Daniel returned to Kish Island, where he met with Iranian officials who, again, denied any knowledge of his father's whereabouts. DJL-Decl. at ¶ 5. He recalls one official giving him a copy of a Fox News article that reported his father had left the country and telling him the incident should "be considered closed." *Id.* Daniel notes how Iranian officials have offered conflicting and often contradictory accounts of his father. *Id.* In one statement, they denied Robert was in Iran; in another, they insisted he had flown back to Dubai and had tried to enter Iran illegally; in a third, they asserted Robert had flown to Pakistan. *Id.* During one meeting, Daniel gave an Iranian official a letter he had written to Ayatollah Khamenei. Despite the official's "pledge[] to provide a response," none was forthcoming. *Id.*

**Testimony of David Levinson—Robert Levinson's Son**

David Levinson provided his testimony in a declaration dated April 16, 2018 ("DL-Decl.").

David was 19 when his father was kidnapped. DL-Decl. at ¶¶ 1-2. He describes his father, alternately, as "gregarious, friendly, and sincere to everyone he met"; the "most amazing man I have ever known"; his "closest confidant"; and the man he "most admired and tried to emulate." *Id.* at ¶ 3.

The "worst weekend" of David's life was when he learned his father had disappeared. DL-Decl. at ¶ 4. He vividly recalls his brother's "scream" when told their father was missing and describes it as "the single worse sound I have ever heard and [] the single worst moment of my life." *Id.* David collapsed on the bathroom floor and experienced his first panic attack. *Id.*

David recounts how years would pass, and the family would receive no information about Robert. DL-Decl. at ¶ 5. They "grew increasingly frustrated, confused, and worried," until November 2010, when they saw Robert in a video, "looking haggard and afraid, but alive." *Id*. David was horrified watching his father plead for help, but also "felt a surge of hope," believing the situation would soon be resolved. *Id*. After receiving no new information, the family was "devastat[ed]." *Id*. Their "familiar, crippling feeling of sadness" resurfaced in 2011, when photographs were released showing Robert in an orange jumpsuit, "holding up signs mocking our country's fruitless effort to return him home." *Id*.

These images haunted David and confirmed his worst fears that his father was "experiencing daily physical torture in addition to his obvious emotional distress." *Id*. DL-Decl. at ¶ 6. He visualized his father in "a cell alone, crying himself to sleep each night" and suffering while laying on "some hard surface," aggravating "the aches and pains he often had complained of back home." *Id*. David also worried whether his father was receiving medical treatment for his chronic high blood pressure and diabetes. *Id*.

David was in college when his father disappeared. DL-Decl. at ¶ 7. His grades began to suffer, and he experienced "a mental breakdown." David sought counseling at school, always careful never to discuss his father's abduction. *Id*. David regrets that his father could not attend his college graduation. *Id*. During the first year his father was imprisoned, David lost 15 pounds. *Id*. at ¶ 8. His "dark hair is now almost entirely gray," and at age 30, he looks older than his age. *Id*. David has repeated nightmares about his father and dreams of seeing him again. *Id*.

In December 2011, David and his mother appeared in a video, pleading with Robert's captors. DL-Decl. at ¶ 9. After the video's release, David became "dishearten[ed] and

disturb[ed]" at the disparaging remarks he received from people who believed his father was responsible for his own fate. *Id*.

David, now married, is sad that his father has never been a part of his family. DL-Decl. at ¶ 10. His mother now lives alone, "in constant pain and sadness of the emotional toll these years have had on her." *Id*. To this day, she refuses to sell the family home, "wanting everything to be the way it currently is" when Robert returns. *Id*. David confirms that each member of his family experiences "daily stress and pain" in their unending crusade to bring their father home safely. *Id*.

### **Testimony of Samantha Levinson—Robert Levinson's Daughter**

Samantha Levinson provided her testimony in a declaration dated February 7, 2019 ("SL-Decl.").

Samantha was 16 when her father was kidnapped. SL-Decl. at ¶¶ 1-2. She "cannot imagine" a "better" or "more decent and loving father," and fondly recalls how he lavished "special attention" on each of his children. *Id*. at ¶ 3.

When Samantha learned her father had been kidnapped, she "felt symptoms of physical pain and shock," ran to her bedroom, fell to the floor, and "let[] out audible screams of emotion." SL-Decl. at ¶ 4. Those "emotions overwhelmed" her to the point she "could not speak." *Id*.

Samantha's mother insisted the children continue with their classes and resume a "normal life" until Robert returned. SL-Decl. at ¶ 4. Samantha was instructed not to publicly discuss her father's situation, as it might jeopardize his release. *Id*. At school, she suffered the taunts of her classmates, saying Samantha's father was being tortured or that he would never be released. *Id*. She frequently would sit in a bathroom stall and cry. *Id*. Samantha regularly visited the school's guidance counselors, who were "concerned" about her emotional health. *Id*.

Samantha joined the family's efforts to free her father. "[A]t some point," however, her family, "concerned how "inconsolable" she had become, "excluded [her] from their meetings with government officials." SL-Decl. at ¶ 4. Samantha's mental state deteriorated "for weeks," afterwards prompting several family members to urge her to speak to a therapist. *Id*. Samantha was depressed, would cry almost every day, and found it difficult to leave the house. *Id*. Her weight "constantly" fluctuated. *Id*. In college, she gained 40 pounds "from binge eating and alcohol abuse," only to shed the weight by "not eating." *Id*. At one point, she was diagnosed with Post-Traumatic Stress Disorder. *Id*. Samantha "regularly" has nightmares of her father being beheaded or tortured, and often wakes up "physically ill or crying."

Samantha also worries "constantly" about her mother, with whom she is "extremely close emotionally." SL-Decl. at ¶ 5. By nature, "a very private person," Christine has had to assume the "pain[ful] and distress[ing]" role of "the public face of the family." *Id*. Samantha believes her mother "worries each and every day about what she can do to get [Robert] home." *Id*.

### Testimony of Douglas Levinson—Robert Levinson's Son

Douglas Levinson provided his testimony in a declaration dated February 12, 2019 ("DCL-Decl.").

Douglas, was 13 and in the seventh grade when Robert "was kidnapped in Iran." DCL-Decl. at ¶¶ 1-2. Growing up, Douglas enjoyed an "extremely close" relationship with his father, whom he "loved and admired," and who was his "best friend." *Id*. at ¶ 3. When Robert started his own business and worked at home, Douglas was "lucky enough" to "get a lot of alone time with him." *Id*. He recalls receiving an e-mail dated March 5, 2007 from his father, with the message: "I hope you miss me as much as I miss you." *Id*.; DCL-Exhibit 13 (e-mail). Douglas did not see the e-mail until March 11—after they knew "something was wrong." DCL-Decl. at

¶ 3.  He nonetheless replied, telling his father how frightened he was, how much he loved him, and how the FBI was searching for him.  *Id*.

Robert's disappearance was particularly "traumatic" for Douglas.  DCL-Decl. at ¶ 4.  On "an almost daily basis," he was confronted with the fact that his father was being held "by a hostile power [that] regularly tortures its victims."  Douglas found his father's precarious situation, "extremely painful," and he became "angry at the world," unable to concentrate, and saw his school grades drop.  DCL-Decl. at ¶ 5.  He suffered from "anxiety" and was "constantly overcome with an irrational fear that something bad" would happen.  *Id*.  To this day, he "undergo[es] treatment for anxiety."  *Id*.

In 2010, the family received an "e-mail extortion note threatening to kill" Robert, attached to which was "a video of him begging for help."  DCL-Decl. at ¶ 6.  When his mother had difficulty opening the attachment, Douglas volunteered.  *Id*.  He recalls being terrified, having recently seen videos of other American hostages, including one showing the beheading of Wall Street Journal reporter, Daniel Pearl.  *Id*.  Douglas worried the video might show his father being killed or beheaded.  *Id*.  He experienced the same fear when the family received the five photographs showing Robert in prison garb.  *Id*.  Douglas recounts how the "constant drumbeat of news" describing "how Iran treated prisoners," kept the family "in a constant state of grief and anxiety," and left him "awake almost every night."  *Id*.

Douglas' "family has never been able to put this behind us," as they all have actively served as "advocates and spokesmen" for his father's release.  DCL-Decl. at ¶ 7.  Douglas spent his 16th birthday with his mother at the White House, meeting with the National Security Advisor and future CIA Director.  *Id*.  For Douglas, constantly retelling his father's story, "keeps the pain and grief fresh."  *Id*.

Finally, Douglas notes the degree to which his father's abduction has affected his mother, and how "[t]he stress and grief have weighed heavily on her," and "the continuing damage it has caused her."  DCL-Decl. at ¶ 8.

## DAMAGES

A.    **Standard of Proof**

Damages available under the FSIA-created cause of action "include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c).  Under the statute, Mr. Levinson may recover damages for his pain and suffering and any economic losses resulting from his incarceration; his immediate family members may recover for economic losses and solatium for their emotional injuries; and all plaintiffs may recover punitive damages.  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 82–83 (D.D.C. 2010).

To successfully press their claim for damages under the FSIA, plaintiffs "must prove that the consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'"  *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted)).

As default winners under the FSIA, they "must prove damages 'in the same manner and to the same extent as any other default winner.'"  *Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232 (D.D.C. 2012) (quoting *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 160 (D.D.C. 2009)).  When assessing these claims, courts carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages."  *Rhodes v. United States*, 967 F. Supp. 2d 246, 313 (D.D.C. 2013)

(emphases in original) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)).  For future damages, a plaintiff must demonstrate entitlement to a "reasonable certainty" or by a preponderance of the evidence and prove damages by a "reasonable estimate."  *Hill*, 328 F.3d at 684.  For past losses, a plaintiff must "prove the *fact* of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (emphasis added), yet need only "reasonably prove" the amount of damages.  *Hill*, 328 F.3d at 684.

Finally, as state sponsors of terrorism have "made all but certain that that evidence does not exist," *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014), proof may be established by affidavit or declaration, and upon evaluation, the finder of fact "may accept Plaintiffs' uncontroverted evidence as true."  *Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 161 (D.D.C. 2013).  *See also Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 20 (D.D.C. 2009) ("Plaintiffs may present such evidence in the form of affidavits or declarations rather than through live witnesses testifying in open court"); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits."); *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 123 (D.D.C. 2002) (In the context of the FSIA, "courts have never doubted the veracity of the factual information attested to in the affidavits.").

Upon consideration of the testimonial and documentary evidence presented, and in accordance of the legal framework set out below, the Special Master considers those damages for pain and suffering and economic losses available to Robert Levinson; solatium and economic damages for Christine Levinson; and solatium damages for Susan Levinson Boothe,

Stephanie Levinson Curry, Sarah Levinson Moriarty, Daniel Levinson, David Levinson, Samantha Levinson and Douglas Levinson.

**B.**   **Pain and Suffering**

To formulate an appropriate award for Robert Levinson, the Special Master is guided by past decisions, mindful both of the "challenge aris[ing] in assigning a dollar value to such pain and suffering," *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017), and the fact that "strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57 (D.D.C. 2009). And while "[p]utting a number on these kinds of harms can be difficult," *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134 (D.D.C. 2005), the Special Master is constrained to "not simply [recommend] what [he] abstractly finds to be fair," *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 34 (D.D.C. 2002), but to "look at damage awards for pain and suffering in other cases brought under the FSIA." *Id.*

Fortunately, the Special Master does not write on a blank slate.  When victims of terrorist attacks, such as Robert Levinson, are held in captivity for an appreciable amount of time, our courts typically apply "a per-diem formula—awarding $10,000 per day of captivity—to compensate for injuries sustained while imprisoned." *Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118 (D.D.C. 2019).

There is a wealth of cases adhering to this formula.  *See, e.g.*, *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1, 6 (D.D.C. 2019) ($1,920,000 for hostage held on 192 days); *Hekmati*, 278 F. Supp. 3d at 163-64 (D.D.C 2017) (awarding $16.02 million in pain and suffering damages for plaintiff's 1,602 days of imprisonment); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015) ($1.68 million for 168 days); *Price*, 384 F. Supp. 2d at 135–36 ($1.05

million for 105 days of captivity); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 153 (D.D.C. 2010) ($5.03 million for 503 days); *Massie v. Government of the Democratic People's Republic of Korea* 592 F. Supp. 2d 57, 66, 74 (D.D.C. 2008) ($3,350,000 for 335 days); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 100 (D.D.C. 2003), *abrogated by, Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004)) ($650,000 for 65 days); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d. 27, 37 (D.D.C. 2001) ($5,640,000 for 564 days); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 51(D.D.C. 2001) ($23 million for 2,354 days); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 26 (D.D.C. 2001) (awarding $2,050,000 for victim held 205 days; $1,260,000 for 126 days; and $50,000 for 5 days); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000) ($24,540,000 for 2,454 days); *Frost v. Islamic Republic of Iran*, Case No. 17-cv-603 (TJK), 2019 WL 5110604, at *24 (D.D.C. August 26, 2019), *report and recommendation adopted in part and rejected in part on other grounds*, 419 F. Supp. 3d 112 (D.D.C 2020)(awarding $310,000 for 310-day period of captivity); *Azadeh v. Islamic Republic of Iran*, No. 16-1467 (KBJ), 2018 WL 4232913, at *18 (D.D.C. Sept. 5, 2018) ($1,140,000 for 114 days of captivity); and *Fritz v. Islamic Republic of Iran*, No. 5-cv-456, 2018 WL 5046229, at *23 (D.D.C. Aug. 13, 2018) ($10,740,000 for 1,074 days held in captivity).

There are, however, instances where courts have deviated from the $10,000-per-day baseline, focusing, instead, on the brutality of the torture and the severity of the physical and mental damage inflicted on the hostages.  In *Acree v. Republic of Iraq*, 271 F. Supp. 2d 179, 185 (D.D.C. 2003), for example the court awarded $35 million to Col. Acree and $30 million to Lt. Col. Fox, captured and held captive in Iraq for 47 and 15 days, respectively, during which they were brutally beaten, starved, and subjected to inhumane treatment.  *Id.* at 221.  In *Cronin v.*

*Islamic Republic of Iran*, 238 F. Supp. 2d 222, 234 (D.D.C. 2002), the plaintiff was captured in

Beirut and severely beaten during the four days he was held captive by members of Hezbollah.

Reasoning that "it would be a perverse application of the [per diem] formula to find that Cronin

is only entitled to $40,000," the court awarded $1,200,000 in compensatory damages. *Id.* at 234.

In *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216 (D.D.C. 2012), the court found damages

for $210,000 "inadequate" to compensate Marvin Wilson and Ronald Wyatt for the 21 days they

were held hostage in Turkey. *Id.* at 231. And although they "were not physically beaten during

their captivity," *id.,* the court awarded each $5,000,000. *Id.* at 232. In *Kapar v. Islamic Republic*

*of Iran*, CA No. 02-0078 (HHK) (D.D.C. September 22, 2004), the court, in its Findings of Fact

and Conclusions of Law, awarded $13,500,000 in compensatory damages to Charles Kapar, as

redress for the six days he was "torture[d]" and suffered "physical and emotional injuries." ECF

No. 22, at ¶¶ 89-90.

   The Special Master suggests these cases have no application to Mr. Levinson.

   Courts focusing solely on the brutality of the treatment and the severity of the injury

generally do so where a hostage has been detained for a comparatively abbreviated period of

time such that a per diem award would prove disproportionate to the inflicted harm. Moreover,

in those instances, courts have benefited from plaintiffs' direct testimony describing the

execrable conditions of their detention and the injuries they suffered. Robert Levinson has been

a captive for more than 13 years in Iran where, by most accounts, he still languishes. As such, he

has been unable to attest to the conditions of his imprisonment or to the cruelties he has been

forced to endure.

   As of March 9, 2020, the day this Court entered judgment on behalf of the plaintiffs, Mr.

Levinson has been imprisoned by the Iranian government for 13 years and one day—or 4,750

calendar days.  The Special Master recommends the Court follow the well-established per diem

formula adopted in this district for American hostages held at length by state sponsors of

terrorism, and award Mr. Levinson $10,000 for each day he has been unlawfully confined in

Iran, or $47,500,000 in damages for pain and suffering.

## C.     Solatium Damages

The Special Master next considers those damages for solatium available to Christine

Levinson, Susan Levinson Boothe, Stephanie Levinson Curry, Sarah Levinson Moriarty, Daniel

Levinson, David Levinson, Samantha Levinson and Douglas Levinson, in light of the analytic

framework below.

Terrorist acts, "by their very definition, are extreme and outrageous and intended to cause

the highest degree of emotional distress." *Belkin*, 667 F. Supp. 2d at 22 (citing *Stethem v. Islamic

Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).  *See also Eisenfeld v. Islamic Republic

of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000) ("[O]ne of the aspects of terrorism is its targeting of

the innocent with the intent to create maximum emotional impact.").  Solatium damages seek to

redress these "extreme and outrageous" acts and compensate for the "'[m]ental anguish,

bereavement and grief' resulting from a loved one's death or injury."  *Schertzman Cohen v.

Islamic Republic of Iran*, No. 17-1214 (JEB), 2019 WL 3037868, at *7 (D.D.C. July 11, 2019)

(quoting *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356-57 (D.C. Cir. 2018)).

The "paradox of solatium," however, is that unlike lost wages, which may easily be

calculated, solatium damages are not readily quantifiable using "models and variables." *Elahi v.

Islamic Republic of Iran*, 124 F. Supp. 2d 97, 111 (D.D.C. 2000) (quoting *Flatow v. Islamic

Republic of Iran*, 999 F. Supp. 1, 32 (D.D.C. 1998)).  Courts, therefore, look for guidance in

"prior decisions."  *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

A review of "prior decisions" in this circuit reveals that family members in a direct lineal relationship are "presume[d] . . . to suffer compensable mental anguish[,] . . . and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011)). In *Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006), the court surveyed past decisions and determined "[s]pouses typically receive greater damage awards than parents [or children], who, in turn, typically receive greater awards than siblings." *Id.* at 269. For claimants like the Levinsons, related to a physically and psychologically injured victim of terrorism, courts typically adhere to the following remedial scale: "$4 million, $2.5 million, $1.5 million, and $1.25 million to spouses, parents, children and siblings, respectively." *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12, 14 (D.D.C. 2012) (quoting *Oveissi*, 768 F. Supp. 2d at 26 n. 10).

It should be noted these awards are not artificial caps but only guidelines designed to promote uniformity in an area not readily receptive to quantification. Stated alternatively, these baseline awards are "not set in stone." *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (quoting *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 74 (D.D.C. 2010)). Indeed, recognizing that "[e]ach victim's suffering is unique," and that "comparing the severity of the mental anguish endured by one victim to another is undoubtedly an inexact science," *Brewer*, 664 F. Supp. 2d at 57, courts have deviated from these baseline numbers where circumstances dictate. *See Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (the *Heiser* damages framework "serves only as a baseline from which the Court may deviate to compensate for specific circumstances.").

In that spirit, courts have enhanced awards for loss of solatium: (1) in the face of

"aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering, such as cases involving torture or kidnapping of a spouse," *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006); (2) where the "evidence establish[es] an especially close relationship," *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014), when compared to "the normal interactions to be expected given the familial relationship," *Oveissi*, 768 F. Supp. 2d at 26-27; (3) in the presence of "medical proof of severe pain, grief or suffering on behalf of the claimant," *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 403 (D.D.C. 2015); or (4) where the "circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26-27.  Downward departures have been imposed where the evidence suggests an attenuated relationship between the victim and his family members. *Valore*, 700 F. Supp. 2d at 86.  And "where no evidence is offered to show injury that an award of solatium damages might compensate," solatium awards have been denied. *Roth*, 78 F. Supp. 3d at 405.

Each member of Robert Levinson's immediate family has amply demonstrated an entitlement to an award for loss of solatium due to the injuries inflicted on Robert.  Christine Levinson, Susan Levinson Boothe, Stephanie Levinson Curry, Sarah Levinson Moriarty, Daniel Levinson, David Levinson, Samantha Levinson and Douglas Levinson have presented highly credible testimony that compellingly evidenced the close relationships each enjoyed with Robert before his abduction, and the comfort and companionship they lost.  As synopsized below, the evidence clearly establishes that Robert Levinson's family members have suffered and continue to suffer a considerable deprivation of his society.

Christine had been married 33 years to Robert at the time of his disappearance. After Robert was abducted, Christine became a single parent and sole provider to her two youngest

children.  For 13 years, she spearheaded a campaign to secure the safe release of a man she

describes as a "loving and attentive husband and father."  She traveled overseas to meet with

Iranian leaders, corresponded and met with U.S. government officials on numerous occasions,

and established a website seeking information on her husband.  Christine has agonized knowing

Robert was in the hands of an authoritarian regime renowned for its abusive treatment of

prisoners.  She was compelled to watch a video and look at photographs of her husband, looking

"disheveled, weak, [] bound in chains," and displaying a "written message begging for help."

Every time Christine believed Robert might return home, her hopes were dashed.  And every

holiday or family occasion served as a grim reminder of his absence.

 Each of Christine's children underscored the devastating impact their father's

disappearance has had on their mother.  Stephanie Booth described how Christine has had to

confront "her own very serious medical crises without [Robert]," and how she has "aged her

more rapidly than most people."  Sarah Levinson Moriarty noted her mother's "pain and constant

disappointment," while Daniel Levinson attested to his mother's declining health.  David

Levinson testified his mother has been "in constant pain," and attested to the "the emotional toll

these years have had on her."  Samantha Levinson described the "pain and distress" her mother

experienced being "the public face of the family," while Douglas Levinson observed how "[t]he

stress and grief have weighed heavily" on his mother.

 Susan Levinson Boothe described her father as "the epitome of what a dad should be"

and "the greatest man [she has] ever known."  Her father's disappearance was profoundly

distressing.  Susan "barely got out of bed," suffered from "horrible insomnia," and was

diagnosed as "clinically depressed."  She has nightmares of her father dying, and through the

years, has "self-medicated with alcohol and cigarettes," and has "turned to emotional eating."

Her pain has never subsided, and she continues to be tormented when she hears accounts of torture inflicted on other Iranian prisoners. To this day, Susan is on a regimen of "anti-depressants and sleeping pills."

Stephanie Levinson Curry grew up in a "close and loving family" with a "devoted" father who played an outsized role in the lives of his children. She lost considerable weight during the first year of Robert's incarceration, and on a daily basis, experiences "pain and grief" over his absence. Stephanie is often "angry at the world" and fell into a "depression that lasted several years."

Sarah Levinson Moriarty grew up with a "wonderful father" who was "deeply involved" with his children. She was traumatized by her father's abduction and deeply pained by the video and photographs showing his deteriorated condition. Sarah has experienced "physical pain" and suffered "repeated panic attacks," attributable to her stress. She has been in therapy for six years and believes her anxiety led to complications delivering her second child. Sarah's consistent efforts to secure her father's release has resulted in her inability to pay sufficient attention to her own family.

Daniel Levinson describes Robert as the man he "loves more than anything in the world." He is tormented knowing his father is being "tortured emotionally and physically, alone, and without the ability to communicate with anyone he knows and loves." His father's disappearance forced Daniel to drop out of school and forego his law school scholarship. He has gained "a significant amount of weight" and his blood pressure has often elevated "to concerning levels." Daniel admits the stress has resulted in him become "irritable, uptight and temperamental," which has affected his ability to form close relationships.

David Levinson describes his father as "gregarious, friendly, and sincere to everyone he

met," the "most amazing man" he had "ever known," his "closest confidant," and the man he "most admired and tried to emulate." Upon learning of Robert's abduction, David collapsed and experienced his first panic attack. He is haunted by images of his father in "a cell alone, crying himself to sleep each night." At one point, David suffered a "mental breakdown," for which he sought counseling, and, to this day, experiences "daily stress and pain."

Samantha Levinson "cannot imagine" a "better" or "more decent and loving father" than Robert. Upon learning he had been abducted, she fell to the floor and "let[] out audible screams of emotion." Samantha's mental health quickly deteriorated, and she became depressed to the point she often was unable to leave the house. In college, Samantha gained considerable weight "from binge eating and alcohol abuse," which she then lost by "not eating." She was diagnosed with PTSD and "regularly" has nightmares in which she visualizes her father being tortured or beheaded.

Douglas Levinson was "extremely close" to his father, whom he "loved and admired," and who was his "best friend." Upon learning his father had been kidnapped, Douglas became "angry at the world," suffered from "anxiety," and was "constantly [] overcome with an irrational fear that something bad" would happen. To this day, he is undergoing "treatment for anxiety."

The Special Master finds the attention, companionship, and comfort lost by Robert Levinson's immediate family members to be significant. The evidence, which is only briefly noted here, establishes that Robert's spouse and children have suffered, and continue to suffer, a profound deprivation having lost the mutual benefit that each family member receives, " including love, affection, care, attention, companionship, comfort, guidance and protection." *Wilson v. City of Chicago*, 758 F.3d 875, 883 (7th Cir. 2014).

- 30 -

In light of this evidence, the Special Master recommends each claimant receive an enhanced solatium award beyond the damages framework recommended in *Heiser* and *Davis*. Robert's status as the longest-held American hostage and the "torture [and] kidnapping" he has endured qualify as "aggravating circumstances" that have "appreciably worsen[ed]" the "pain and suffering" of his immediate family members.  *Greenbaum*, 451 F. Supp. 2d at 108. Moreover, the "evidence establish[es] an especially close relationship," between Robert and his spouse and children beyond "the normal interactions to be expected given the familial relationship." *Spencer*, 71 F. Supp. 3d at 28.  The herculean efforts jointly and individually undertaken by members of the Levinson family to secure their father's freedom is a testament to those close relationships.  Finally, the "circumstances surrounding" Robert's abduction and detention by Iranian forces unquestionably rendered "the[ir] suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26-27.  As detailed above, the Levinson family has been subjected to 13 years of shifting and misleading explanations by U.S. and Iranian officials.  Each member of the family has had to watch a video and photographs of Robert, chained and in prison garb, begging for help.  They have lived with constant reminders of the brutalities Iran inflicts on its captives, and each has upended their lives for more than a decade to gain Robert's release.

As stated, for families related to victims physically and psychologically injured in a terrorist attack, courts typically award "$4 million, $2.5 million, $1.5 million, and $1.25 million to spouses, parents, children and siblings, respectively."  *Davis*, 882 F. Supp. 2d at 14 (quoting *Oveissi*, 768 F. Supp. 2d at 26 n. 10).  And while past solatium awards are significant sources of guidance, "different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards." *Fraenkel*, 892 F.3d at 362 (internal quotation marks and citation omitted).  In that vein, more than one court has deviated from the established

framework in comparable situations.  In *Anderson*, the court awarded solatium damages of $10 million and $6.7 million, respectively, to the spouse and the daughter of Terry Anderson, who was held captive in Beirut for "nearly seven years."  90 F. Supp. 2d at 114.  And in *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 70 (D.D.C.1998), the court awarded damages of $10 million and $9 million, respectively, to the spouses of victims held for 63 months and 44 months.

In light of compelling evidence demonstrating the Levinson family suffered for more than 13 years, not knowing if Robert Levinson was being tortured or was even alive, the Special Master recommends Christine Levinson, who stoically spearheaded the campaign, receive an enhancement of $10 million in addition to the $4 million baseline solatium award recommended in *Heiser* and *Davis*.  The Special Master further recommends Susan Levinson Boothe, Stephanie Levinson Curry, Sarah Levinson Moriarty, Daniel Levinson, David Levinson, Samantha Levinson and Douglas Levinson each receive an enhancement of $5 million in addition to the $1.5 million baseline award.

## D.    <u>Economic Damages</u>

Christine Levinson prays for economic damages for herself and for Robert Levinson.

On her own behalf, Christine asks to be reimbursed for her travel expenses "to such places as Iran, Washington D.C. and New York to meet with Iranian and American officials"; for her costs retaining attorneys "employed [] to help her husband"; and for the  "significant amounts of money" she expended "in her campaign to have [Robert Levinson] freed."  Complaint ¶ 38.

On behalf of Robert Levinson, Christine seeks compensation for "the loss of all income for the ten-year period he has been held captive."  Complaint ¶ 32.  To support her claim, Christine testified that, following Robert's retirement from the FBI in 1988, he worked for "a

couple of private companies," as a "private investigator doing mostly high-level international investigations," CL-Decl. at ¶ 3, specializing in "international organized crime, money laundering and counterfeiting." Christine Hrg. Tr. 91:9,19-20.  Christine Hrg. Tr. 92:15-16. According to Christine, between 1988 and 2007, Robert's income, "including his FBI retirement," ranged from "a low of $84,475 to a high of $228,852"; "[n]ot counting his pension," he earned "a little more than $100,000 a year."  CL-Decl. at ¶ 3.  *Id.*  These fluctuations are reflected in Robert and Christine's joint tax returns introduced at trial for 1998 (Tr. Ex. 6), 2000 (Tr. Ex. 7), 2001 (Tr. Ex. 8), 2002 (Tr. Ex. 13), 2003 (Tr. Ex. 16), 2004 (Tr. Ex. 17), 2005 (Tr. Ex. 18), 2006 (Tr. Ex. 20), and 2007 (Tr. Ex. 21).  The family's income during this time period was also captured in a one-page chart, entitled "Christine Levinson—Economic Losses," submitted as an exhibit to plaintiffs' Motion for Default Judgment. ECF No. 37-31a and 42. Notably, the chart was created without reliance on the family's W-2s or 1099s.  *Id.*

The Special Master recommends both claims for economic losses be denied.

28 U.S.C. § 1605A establishes a cause of action for economic damages resulting from an act of state-sponsored terrorism.  *See Moradi*, 77 F. Supp. 3d at 71 ("as a general rule, lost earnings—past and future—are compensable damages").  Importantly, these damages must be proven "by a reasonable estimate," *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213 (D.D.C.2012), and supported by corroborative evidence.

Apropos of her personal claim, Christine failed not only to quantify her purported damages, she has also produced no evidence supporting her prayer for relief.  She has supplied neither the Court nor the Special Master with relevant documentation such as sales slips, invoices, cash register or credit card receipts, bank statements, canceled checks, or proof of transferred electronic funds.  Faced with a similar dearth of evidence, courts consistently have

denied claims for economic losses.  In *Kaplan*, for example, the court refused a plaintiff's request to be reimbursed for stolen tools and expenses, "where no receipts verifying the value of the stolen tools or for the expenses the family incurred during their time away from home."  213 F. Supp. 3d at 40.  And in *Wyatt*, 908 F. Supp. 2d at 230, the court denied plaintiffs' request for medical costs unsupported by "any evidence of what costs specifically were incurred," and for "travel expenses" lacking "any evidence supporting this claim."

In sum, Christine "failed to meet the minimum evidentiary threshold supporting [her] respective claim[] for economic damages."  *Kaplan*, 213 F. Supp. 3d at 41.  The Special Master, therefore, recommends her request to be reimbursed for her own economic losses be denied.

Christine's claim on behalf of Robert Levinson is similarly infirm.  Before authorizing a recovery for economic losses, a court "must be presented with evidence which affords a reasonable basis for measuring the claimant's loss."  *Bova v. Islamic Republic of Iran*, Case No. 15-cv-1074 (RCL), 2020 WL 2838582, at *11 (D.D.C. May 31, 2020).  Lost earnings are not hard to quantify" and courts "will not excuse plaintiffs' failure to support the claim for lost earnings with competent evidence."  *Moradi*, 77 F. Supp. 3d at 71.  And "[a]lthough mathematical exactitude is often impossible, proof of economic losses should be established with reasonable certainty and not grounded in speculation, contingency, or conjecture."  *Id.* Here, no such evidence was offered.  *Bova*, 2020 WL 2838582, at *11.

Rather than supply "proof of [Robert's] economic losses," Christine invites the court to speculate what the family's income might have been between 1998 and 2007.  The Special Master recommends this invitation be declined.  Christine admits her husband was employed by different companies at different rates of income yet supports her claim with a few financial records and charts.  Notably, she has tendered no forensic economic report which might have

supplied the "reasonable certainty" necessary for the court to render an informed opinion. *See Reed*, 845 F. Supp. 2d at 214 ("[t]he report of a forensic economist may provide a reasonable basis for determining the amount of economic damages in an FSIA case."); *Belkin*, 667 F. Supp. 2d at 24 (adopting the report of a forensic economic expert who "based his calculations on reasonable and well-founded assumptions").  Instead, Christine Levinson asks the court to award economic damages based on incomplete tax returns and based on her testimony, which without more, is "insufficient to support any award of economic damages."  *Moradi*, 77 F. Supp. 3d at 71.

The Special Master, therefore, recommends this Court deny both Robert Levinson's and Christine Levinson's claims for economic damages.

## <u>CONCLUSION</u>

For the foregoing reasons, the Special Master recommends Robert Levinson be awarded Forty-Seven Million Five Hundred Thousand Dollars ($47,500,000) in compensatory damages for pain and suffering.  The Special Master further recommends Christine Levinson be awarded Fourteen Million Dollars ($14,000,000) in compensatory damages for loss of solatium.  The Special Master further recommends Susan Levinson Boothe, Stephanie Levinson Curry, Sarah Levinson Moriarty, Daniel Levinson, David Levinson, Samantha Levinson and Douglas Levinson, each be awarded Six Million Five Hundred Thousand Dollars ($6,500,000) in compensatory damages for loss of solatium.  Finally, the Special Master recommends this Court deny Robert Levinson's and Christine Levinson's claims for economic damages.

Dated:  July 16, 2020                                    Respectfully submitted,


By:*/s/ Alan L. Balaran*
Alan L. Balaran, Esq.
Special Master

- 35 -